# 24-748-cv

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

JENNIFER ARAOZ,

Plaintiff-Appellant,

- against -

THE NEW ALBANY COMPANY LLC, THE WEXNER FAMILY CHARITABLE
FUND, THE YLK CHARITABLE FUND, ABIGAL S. WEXNER, THE WEXNER
FOUNDATION, and LESLIE H. WEXNER,

Defendants-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF NEW YORK (HON. ANN M. DONNELLY)

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

EDELSTEIN & GROSSMAN
*Attorney for Plaintiff-Appellant*
501 Fifth Avenue, Suite 514
New York, NY 10017
(212) 871-0571
*Of Counsel: Jonathan I. Edelstein*

# **TABLE OF CONTENTS**

Table of Authorities ............................................................. iii

Statement of Subject Matter and Appellate Jurisdiction ........................................... 1

Statement of the Issues Presented ................................................. 1

Statement of the Case.................................................................2

    A.    The 2019 New York State Lawsuit (The Epstein Action) ................... 2

    B.    The Lawsuit Against the Wexner Defendants ..................................... 5

    C.    The Motion to Dismiss.................................................9

    D.    The Order and Judgment Appealed From ........................................14

Summary of the Argument.......................................................15

Argument……………. .......................................................18

    POINT I

    PLAINTIFF'S ACTION IS NOT BARRED BY RES JUDICATA……....18

        A.    Standard of Review..................................................18

        B.    Under the Circumstances of This Case, "Contractual Privity" Applies and the Privity Element of Res Judicata Was Not Established..................................19

        C.    Alternatively, the Factual Basis of This Action Was Not Available with Reasonable Diligence in 2019...................28

i

POINT II

THE COMPLAINT PLED FACTS SUFFICIENT TO
ESTABLISH PERSONAL JURISDICTION AT THE
PLEADING STAGE; ALTERNATIVELY, THE
APPROPRIATE REMEDY SHOULD BE TO TRANSFER
VENUE TO THE SOUTHERN DISTRICT OF OHIO
WHERE PERSONAL JURISDICTION INDISPUTABLY
EXISTS…………….....................................................................33

    A.    Standard of Review ...................................................33

    B.    The Amended Complaint Sufficiently Pleads
           Personal Jurisdiction ...............................................34

    C.    Alternatively, Transfer to the Southern District
           of Ohio is Appropriate .............................................41

Conclusion………… ...............................................................44

Certificate of Compliance .........................................................45

## SPECIAL APPENDIX

Memorandum Decision and Order dated Feb. 29, 2024......................................SA1

Clerk's Judgment entered Mar. 1, 2024.............................................................SA14

## <u>TABLE OF AUTHORITIES</u>

**Cases:**

<u>Allen v. Institute for Family Health,</u>
    159 A.D.3d 554 (1st Dept. 2018) ...................................................38

<u>Asahi Metal Indus. Co. v. Superior Ct. of California,</u>
    480 U.S. 102 (1987)......................................................................40

<u>Boguslavskiy v. S. Richmond Sec., Inc.,</u>
    225 F.3d 127 (2d Cir. 2000) ............................................16,20,21,22

<u>Bolar v. Frank,</u>
    938 F.2d 377 (2d Cir. 1991) ........................................................42

<u>Brown v. Quiniou,</u>
    2003 U.S. Dist. LEXIS 6257 (S.D.N.Y. 2003) .............................28

<u>Cerullo v. Aetna Cas. & Sur. Co.,</u>
    41 A.D.2d 1 (4th Dept. 1973) ......................................................25n

<u>Chloe v. Queen Bee of Beverly Hills, LLC,</u>
    616 F.3d 158 (2d Cir. 2010) ...............................................33,34,40

<u>Cole v. Miletti,</u>
    133 F.3d 433 (6th Cir. 1998) ......................................................43

<u>Computer Assocs. Int'l, Inc. v. Altai, Inc.,</u>
    126 F.3d 365 (2d Cir. 1997) ....................................................18,19

<u>Daimler AG v. Bauman,</u>
    571 U.S. 117 (2014).....................................................................33

<u>Daou v. BLC Bank, S.A.L.,</u>
    42 F.4[th] 120 (2d Cir. 2022) ........................................................36

<u>Doe 1 v. JPMorgan Chase Bank, N.A.,</u>
    2023 WL 3945773 (S.D.N.Y. 2023) .........................................12n,20n,22,25,
    ...................................................................................26,27,28,37

iii

Edwardo v. Roman Catholic Bishop of Providence,
    66 F.4th 69 (2d Cir. 2023) ............................................................37,38

Esquire Trade & Fin., Inc. v. CBQ, Inc.,
    562 F.3d 516 (2d Cir. 2009) ..........................................................20,21,22

Fed. Housing Fin. Agcy. v. Nomura Holding America, Inc.,
    873 F.3d 85 (2d Cir. 2017) ...............................................................31

Giraldo v. Kessler,
    694 F.3d 161 (2d Cir. 2012) ...............................................................2n

Giuffre v. Prince Andrew,
    579 F. Supp. 3d 429 (S.D.N.Y. 2022) ......................................22,23,23n,24,
    .......................................................................................24n,25,25n,27

Goodyear Dunlop Tires Operations, S.A. v. Brown,
    564 U.S. 915 (2011)......................................................................33,34

Henderson v. INS,
    157 F.3d 106 (2d Cir. 1998) ..............................................................36

In re Hyman,
    502 F.3d 61 (2d Cir. 2007) ...............................................................19

In re Lavender,
    399 Fed. App'x 649 (2d Cir. 2010) .......................................................31

In re Layo,
    460 F.3d 289 (2d Cir. 2006) ..............................................................28

Ingraham v. Carroll,
    90 N.Y.2d 592 (1997).....................................................................38

Int'l Shoe Co. v. State of Washington,
    326 U.S. 310 (1945)......................................................................33,34

Jacqueline S. v. City of New York,
    81 N.Y.2d 288 (1993).....................................................................39

iv

Korenblum v. Citigroup, Inc.,
    2015 WL 6001275 (S.D.N.Y. 2015) ............................................20

LG 67 Doe v. Resurrection Lutheran Church,
    75 Misc. 3d 327 (Sup. Ct., Erie Co. 2022) ....................................32

Licci v. Lebanese Canadian Bank,
    20 N.Y.3d 327 (2012) ....................................................................36

Minette v. Time Warner,
    997 F.3d 1023 (2d Cir. 1993) ........................................................42

People v. Chi Keung Seto,
    182 Misc. 2d 255 (Sup. Ct., N.Y. Co. 1994) ................................32

Phelps v. McClellan,
    30 F.3d 658 (6th Cir. 1994) ..........................................................43

Porina v. Marward Shipping Co.,
    521 F.3d 122 (2d Cir. 2008) ....................................................33,34

Prince v. The Intercept,
    634 F. Supp. 3d 114 (S.D.N.Y. 2022) ..........................................34

Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.,
    2001 WL 38285 (S.D.N.Y. 2001) ................................................21

Simmons v. Trans Express, Inc.,
    16 F.4th 357 (2d Cir. 2021) ......................................................18,19

St. Pierre v. Dyer,
    208 F.3d 394 (2d Cir. 2000) ..........................................................19

Tarrazi v. 2025 Richmond Ave. Assocs.,
    260 A.D.2d 468 (2d Dept. 1999) ..................................................25n

Taylor v. Vermont Dep't of Educ.,
    313 F.3d 768 (2d Cir. 2002) ........................................................20n

TechnoMarine SA v. Giftports, Inc.,
    758 F.3d 493 (2d Cir. 2014) ............................................................2n

Thackurdeen v. Duke Univ.,
    660 Fed. App'x 43 (2d Cir. 2016) ....................................18,42,43

Thompson v. Global Contact Servs.,
    2021 WL 3425378 (E.D.N.Y. 2021) ...............................................2n

Williams v. New York City Housing Auth.,
    816 Fed. App'x 532 (2d Cir. 2020) ..........................................2n,27

Zenith Radio Corp. v. Hazeltine Research, Inc.,
    401 U.S. 321 (1971)........................................................................21

**Statutes and Rules:**

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1332 ...............................................................................1

NY CPLR § 302 ...........................................................34,35,36,37,
    ..............................................................................................38,39

Ohio Rev. Code § 2305.03 ...............................................................18,43

**Other Authorities:**

Black's Law Dictionary 457 (6th ed. 1990)............................................32

18 Charles A. Wright et. al., Federal Practice & Procedure,
    § 4443, at 384 (1981)....................................................................21

vi

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

Plaintiff-Appellant JENNIFER ARAOZ, by and through the undersigned counsel, respectfully submits this brief in support of her appeal from (i) a Judgment of the United States District Court for the Eastern District of New York (Hon. Ann M. Donnelly, J.), entered March 1, 2024, which dismissed her complaint; and (ii) the Memorandum Decision and Order of the same Court and Judge entered February 29, 2024, upon which such judgment was based.

The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) and this Court has jurisdiction pursuant to 28 U.S.C. § 1291. Defendant's appeal is as of right.

## STATEMENT OF THE ISSUES PRESENTED

1.     Did the district court err in finding that plaintiff-appellant Araoz's claims against the defendants-respondents are barred by res judicata due to the discontinuance of an earlier state-court action against other parties?

2.     Did the district court err in finding that the complaint failed to plead sufficient facts to establish personal jurisdiction, or alternatively, should the appropriate remedy for any defect in jurisdictional pleading be transfer of venue to the Southern District of Ohio rather than dismissal?

Plaintiff submits that the answer to each of the above questions is "yes."

1

## STATEMENT OF THE CASE

This appeal arises from civil litigation brought against the defendants-appellees by plaintiff-appellant Jennifer Araoz, a victim of the notorious sexual predator Jeffrey Epstein. Araoz alleges that defendant-appellee Leslie Wexner (*inter alia*, the former CEO of Victoria's Secret), his wife Abigail Wexner, and several business entities and charitable foundations under the Wexners' control, aided, abetted and/or negligently failed to prevent Epstein from abusing Araoz and other minor victims. Araoz appeals from an order dismissing Araoz's claims against the Wexners on grounds of res judicata and lack of personal jurisdiction.

### A.    The 2019 New York State Lawsuit (The Epstein Action).

On or about August 14, 2019, Araoz commenced an action in the New York State Supreme Court, New York County, against the Estate of Jeffrey Epstein, Ghislaine Maxwell, and Jane Doe Nos. 1-3, which was assigned docket number 950010/2019 ("the Epstein Action").[1]  Subsequently, on October 10, 2019, Araoz

---

[1] While the original complaint in the 2019 action was not made part of the district court record, it is well settled that this Court may take judicial notice of documents in the state court docket when considering whether a lawsuit is barred by res judicata.  See Williams v. New York City Housing Auth., 816 Fed. App'x 532, 534 (2d Cir. 2020), citing TechnoMarine SA v. Giftports, Inc., 758 F.3d 493, 498 (2d Cir. 2014) and Giraldo v. Kessler, 694 F.3d 161, 164 (2d Cir. 2012); see also Thompson v. Global Contact Servs., 2021 WL 3425378, *5-6 (E.D.N.Y. 2021) (collecting cases).  The original complaint in the 2019 action may be found as document 2 in the NYSCEF docket for New York County index number 950010/2019, and/or at the following specific URL link:

2

filed a First Amended Complaint in the Epstein Action which included numerous additional defendants. (A63-118).[2]  None of the defendants in the federal lawsuit from which this appeal arises were named in either the original or amended complaint in the Epstein Action. (A63).

The Epstein Action was brought under the New York State Child Victims Act ("CVA"), which temporarily revived the statute of limitations for otherwise time-barred claims made by persons who had been sexually abused as minors. (A64-65).  Araoz alleged that at the age of 14, when she attended a public high school near Epstein's residence at 9 East 71st Stret in Manhattan, Epstein groomed and sexually abused her over a period of more than a year. (A65, 85-97).

The defendants in the Epstein Action included (i) Epstein's estate; (ii) the executor of the estate; (iii) the trustees of a trust, "The 1953 Trust," to which, Araoz claimed, Epstein fraudulently transferred his assets shortly before committing suicide; (iv) several employees of Epstein who worked at the 71st Street address and/or Epstein's corporate offices, including Rosalyn Fontanilla, Ghislaine Maxwell, Lesley Groff, Cimberly Espinosa; (v) the holding company for the 71st Street property, Nine East 71st Street Corp.; (vi) NES, LLC, which was the

---

https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=CwuhhjSSjUl30efulsBtuA==

[2] Citations to "A" followed by a page number refer to the Plaintiff-Appellant's Appendix, submitted herewith in four volumes.

management company for the 71st Street property; (vii) ostensible trusts, foundations, and nonprofit corporations through which, under the guise of charity, Epstein maintained funds through which he furthered his sexual exploitation of Araoz and others; and (viii) holding companies that were fraudulently conveyed to the 1953 Trust. (A66-78).

Araoz alleged that in September 2001, a recruiter employed by Epstein recruited her from Talent Unlimited High School, a public high school for the performing arts where Araoz was then a student, following which Epstein, with the aid of his other employees, groomed her to perform sexual acts, building from massages and partial nudity to an outright rape which occurred in 2002. (A85-97).

On or about July 17, 2020, while the Epstein Action was pending, Araoz and the defendants in that action stipulated to participate in the Epstein Victims' Compensation Program, a settlement program set up by independent claims administration experts. (NYSCEF Doc. 41 in New York County Index No. 950010/2019 at 1).[3]  The parties agreed that judicial economy would be served by "staying this action unless and until [Araoz] elects to resume this litigation," in

---

[3] As set forth in footnote 1 above and the authorities cited therein, this Court may take judicial notice of the stipulation because it is part of the electronic docket of the Epstein Action.  In addition to being available in the NYSCEF docket at the location set forth in the above parenthetical citation, it may be accessed at https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=odxN4txQiMfpzi R/J7PWwA==

anticipation that "[Araoz] may resolve her claims against one or more of the Defendants herein via the [Compensation] Program." (Id.) It was therefore stipulated that the Epstein Action was stayed, and it was further stipulated that "*nothing herein requires Plaintiff to discontinue this action as against any Defendants whom she does not release via the Program*." (Id. at 1-2) (emphasis added).

Araoz's participation in the compensation program was successful and resulted in her executing a release in favor of the defendants in the Epstein Action in exchange for monetary compensation. (A919). Thereafter, on November 10, 2020, plaintiff executed a stipulation of discontinuance in the Epstein Action pursuant to the release. (A121-23).

## B. The Lawsuit Against the Wexner Defendants.

On August 14, 2021, Araoz filed a pro se summons with notice in the New York Supreme Court, Queens County, against The New Albany Company LLC, Leslie H. Wexner, Abigail S. Wexner, The YLK Charitable Fund, The Wexner Family Charitable Fund, and Wexner Foundation, which was assigned index number 400298/2021.[4] Thereafter, by notice dated January 7, 2022, the defendants

---

[4] This summons is document 1 in the NYSCEF electronic docket for Queens County Index No. 400298/2021, and may also be found at https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=zMrbR0jEfLMo YNg3m_PLUS_zTjQ==

removed the lawsuit to the United States District Court for the Eastern District of New York. (NYSCEF Docs, 15-16 in Queens Co. Index No. 400298/2021).[5]

On or about June 29, 2022, Araoz filed a complaint in the Eastern District of New York (A124-71), followed by an Amended Complaint on or about January 16, 2023 (A172-216), the latter of which remained the operative pleading at the time of the underlying litigation.[6] The gravamen of the allegations in the Amended Complaint was that the Wexners and their associated entities, including The New Albany Company ("New Albany") and their foundations, owned and/or controlled the East 71st Street house where Araoz was abused. (A172-73). The Amended Complaint further alleged that Epstein worked for Leslie Wexner and that Epstein was a president and/or officer of New Albany from 1998 to 2007, a trustee of the Wexner Foundation from 1992 to 2007, an officer of the Wexner Family

---

[5] These documents may be accessed via NYSCEF or at https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=NRF/v1QIjD02g6e6K12/HQ== and https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=BQUfe0Q9mHejUedZ6Av7_PLUS_g==

[6] In the papers below, the defendants-appellees repeatedly highlighted and harped on allegations that were common to these pleadings and the complaint in the Epstein Action, describing the pleadings in this action as *inter alia* a "cut-and-paste job." Many of the allegations that were identical to the two actions are precisely what would be expected to be identical, such as Araoz's age, the descriptions of Epstein's abuse of Araoz, the sexual crimes that were committed against Araoz under New York law, and the description of various persons who aided and abetted the abuse. In any event, this is litigation, not academia or creative writing, and pleadings are not judged on their originality.

Charitable Fund from 2001 to 2004. (A176).

The Amended Complaint alleged in detail that Leslie Wexner and his entities had a close and long-standing relationship with Epstein, which began in or around 1986 and continued well into the 2010s, and that Wexner knew of Epstein's sexual proclivities but nevertheless granted Epstein a power of attorney and allowed Epstein to use his properties and business entities to perpetrate sexual crimes. (A183-90). The Amended Complaint then recounted the details of Araoz's recruitment and abuse by Epstein as previously alleged in the Epstein Action. (A190-96). The Amended Complaint further alleged that Wexner's entities were used to facilitate a fraudulent transfer of the 71st Street property as part of a cover-up by Epstein. (A196-99). Pursuant to these allegations of fact, Araoz sought a declaratory judgment that the 71st Street property was owned and/or controlled by Leslie Wexner and/or associated entities and alleged that the Wexners and Wexner entities were negligent in their supervision of the property and/or of Epstein. (A199-207). Araoz also alleged claims for fraudulent conveyance, aiding and abetting, conspiracy, and intentional infliction of emotional distress. (A207-13).

As to jurisdiction, the Amended Complaint alleged that during the relevant time period, Leslie Wexner maintained a residence at the East 71st Street property. (A174). The Amended Complaint alleged further that personal jurisdiction existed against him because he maintained a residence at the property, conducted business

7

in New York "with a fair measure of permanence" as an owner of L Brands and Victoria's Secret, and transacted business out of the 71st Street property including employing and supplying goods to Epstein. (A179-80). It was alleged that Abigail Wexner also maintained residence at the property, conducted business in New York with a fair measure of permanence and continuity, and that she was present in New York as the founder and president of YLK Charitable Fund. (A180). The YLK Charitable Fund, in turn, allegedly was used to facilitate and hide Epstein's crimes in that the only donations to that fund were made by Epstein from the New York address, including a transaction that was in almost the exact amount that Wexner had originally paid for the 71st Street property. (A180, 180-81).

It was further alleged that New Albany conducted business in New York with a fair measure of permanence and continuity in that Epstein was an officer thereof until 2007, that Epstein perpetrated his crimes from New York in the course of his duties to New Albany, that he used New Albany to shield his crimes from disclosure, and that New Albany employed the persons he used to aid his crimes and cover-ups. (A180). Finally, plaintiff alleged that personal jurisdiction likewise existed over The Wexner Family Charitable Fund and the Wexner Foundation because Epstein, as an officer of these entities, again used them during the relevant time to aid his crimes and cover-ups. (A181-82).

Thus, although acknowledging that the corporate defendants were

incorporated in Delaware and had their principal places of business in Ohio (A175-76), the Amended Complaint pled a nexus between these entities and New York through Epstein's use of them to perpetrate his crimes, including his abuse of Jennifer Araoz.

## C.    The Motion to Dismiss.

By motion filed April 17, 2023, the defendants-appellees sought an order dismissing the complaint pursuant to Fed. R. Civ. Pro. 12(b)(1), 12(b)(2) and 12(b)(6). (A14-15). As relevant to the order appealed from and to this appeal, defendants argued that the dismissal of the Epstein Action constituted a judgment on the merits and that, because Araoz alleged an "employment or agency relationship" between them and certain defendants in the Epstein Action, this lawsuit was barred by res judicata. (A27-29, 30-38).

Defendants further contended that, during 2001-02 when Araoz was abused by Epstein, none of them had any association with or ownership of the 71st Street property, and as such, they had no connection to New York upon which personal jurisdiction could be based. (A29-30, 50-58). Defendants argued that the Wexners did not reside in New York during the period complained of, that they did not have any personal relationship with New York that was related to Araoz's injuries, and that the Wexner entities were exclusively domiciled in Delaware and/or Ohio. (A50-58). In support of these contentions, defendants submitted affidavits from the

9

Wexners' director of security, the Wexners themselves, and the current CEOs of their nonprofit entities, together with final bills, tax records, and a document in which Wexner purported to resign as an officer and/or director of Nine East 71st Street Corp. (A220-57).

Plaintiff submitted a memorandum opposing the motion to dismiss. (A259-99). On the res judicata issue, plaintiff argued that the issues in this lawsuit were different from those in the Epstein Action (A274-77) and that this lawsuit was based on new evidence that was fraudulently concealed and/or could not have been discovered with due diligence (A277-79, 302-12). *Inter alia*, plaintiff contended that the Wexners' legal team had gone to great length to keep their names out of public filings (A278, 307-08), and that evidence of the Wexners' knowledge of Epstein's propensities and their involvement in his crimes arose from recent civil actions and criminal trials, recently-unsealed deposition testimony, and/or recent news reports (A278, 302-12). Plaintiff herself attested that as a 14 and 15-year-old girl being molested by Epstein, she had no knowledge of the relationship between him and the Wexners and didn't have such knowledge at the time she initiated the Epstein Action. (A316-19).

On personal jurisdiction, plaintiff argued that she need only make a prima facie showing at the pleading stage, the defendants' self-serving affidavits were insufficient to defeat jurisdiction at this stage, and that the complaint pled

purposeful activities in New York including residence in the state and direct use of the Wexner entities to facilitate and/or hide Epstein's crimes. (A290-98). Plaintiff noted that the defendants' affidavits did not deny that Epstein was an officer of the Wexner entities at the relevant time, that he had control over the Wexners' finances, and/or that the Wexner entities employed the people who aided and abetted Epstein in recruiting, grooming and trafficking minors. (A297-98). Moreover, plaintiff pointed out that some documents proffered by the Wexners actually showed, *inter alia*, that bills for the 71st Street property were sent to Abigail Wexner years after Epstein ostensibly began living there. (A313).

As further evidence on this issue, plaintiff presented the expert affirmation of Matthew J. Simon, Esq., an experienced real estate and corporate lawyer, attesting to the incompleteness of the documentation attached to the defendants' motion, noting that none of the sale documents common in New York had been provided, and opining that the bills attached to the moving papers were entirely consistent with joint and/or pro rata occupancy of the East 71st Street property. (A320-24). Plaintiff further submitted a sweeping power of attorney executed by Leslie Wexner in July 1991 which essentially gave Epstein complete control over Wexner's finances (A325-27), and noted that there was no documentation of this power of attorney being revoked.

Defendants submitted a reply memorandum arguing in pertinent part that

this lawsuit and the Epstein Action arose from the same transaction, that privity "indisputably" existed by reason of an agency relationship, that no exception to res judicata applied, and that the allegations against defendants merely amounted to "general contacts" insufficient to establish personal jurisdiction. (A823-51).

By letter dated October 20, 2023, defendants submitted supplemental authority to the district court, consisting of a decision of this Court which they argued was relevant to personal jurisdiction. (A852-64).

By letter dated January 18, 2024, plaintiff likewise submitted supplemental authority to the district court. (A865). This consisted, in pertinent part, of a decision issued by Judge Rakoff denying motions to dismiss three lawsuits against banks that were alleged to have abetted Epstein (A866-69),[7] and an opinion finding that a settlement agreement with Epstein did not have res judicata effect in Virginia Giuffre's lawsuit against Prince Andrew (A870-915).[8]

On January 24, 2024, defendants made a letter application to strike the

---

[7] The order in the Deutsche Bank case that was attached to the plaintiff's submission appears to be an initial order denying Deutsche Bank's motion to dismiss rather than the subsequent memorandum opinion explaining the reasons for that order. However, those reasons are explained in a related decision, Doe 1 v. JPMorgan Chase Bank, N.A., 2023 WL 3945773 (S.D.N.Y. 2023) (Rakoff, J.), which will be discussed in detail in Point I infra and which makes clear that the release at issue in that case was the Epstein compensation program's form release, i.e., the same one at issue here.

[8] Plaintiff's submission also included excerpts of deposition testimony given by Giuffre, which were subsequently stricken by the district court and thus not included in the record on appeal.

plaintiff's supplemental authorities as irrelevant and scandalous. (A916-17).

On January 26, 2024, plaintiff responded to the defendants' letter application, explaining that "[a]t minimum, both the banking case and the Prince Andrew case are relevant to defendants' res judicata claims:"

> In Deutsche Bank's motion to dismiss raised a threshold question that applies to the claims brought against it. That threshold question was the question of a release between the plaintiff there and the Epstein Estate. *Just two months prior to instituting this action, plaintiff there signed the exact same release with the Epstein Estate that the Plaintiff in this case signed.* In exchange for that, the releasee received a monetary payment, and corollary to that executed a very broad release with the Epstein estate.

> The court pointed out that Deutsche bank was not a party to the agreement and stated, "since when under applicable law does a release between two parties extend to possible claims against third parties?" In denying the motion to dismiss, the court found that plaintiff's release of the Epstein Estate did not release financial institutions such Deutsche bank and JP Morgan.

> Here, Mr. Wexner was essentially a financial institution to Jeffrey Epstein. He signed over a sweeping power of attorney to Jeffrey Epstein, which was in effect from 1991 to 2008, which gave Mr. Epstein full power and authority to act on his behalf over his multibillion-dollar estate. It gave Mr. Epstein the ability to borrow money, sign checks, make investments, buy and sell properties, negotiate and sign contracts and even hire and fire personnel. We alleged that Mr. Epstein used some of Mr. Wexner's money for hush money payments, including the money that was sent from Mr. Wexner's Charity to Mr. Epstein's charity, which is known to have used funds to make hush money payments.

> In Prince Andrew's motion to dismiss, the main
> argument was that Epstein's release with the plaintiff was
> intended to cover him. The court found that the
> settlement agreement was ambiguous, and it was a triable
> issue of fact whether it was intended to cover Prince
> Andrew that could not be decided on a motion to dismiss.

(A918-20) (citations omitted) (emphasis added).

By minute entry of February 1, 2024, the district court struck certain

excerpts of the Guiffre deposition which were attached to the plaintiff's January

24, 2024 letter, but did not strike the Deutsche Bank and Prince Andrew decisions

albeit opining that they "[did] not appear to be relevant." (A11, Docket Entry 50).

## D.    The Order and Judgment Appealed From.

On February 29, 2024, the district court issued a Memorandum Decision and

Order granting defendants' motion to dismiss. (A921-33). The decision primarily

addressed the issue of res judicata (A925-31) but also included a parenthetical

finding regarding personal jurisdiction. (A932).[9]

On the res judicata issue, the district court first found that the stipulation of

discontinuance in the Epstein Action constituted an adjudication on the merits.

(A926). Then, noting that "both New York and federal courts have rejected a

---

[9] Because these were the only issues passed upon by the district court, these
are the only issues that will be addressed in this brief. Plaintiff-appellant's position
is that any issues not adjudicated by the district court are not ripe for review and
should appropriately be addressed by the district court after a remand. If
defendants-appellees raise these issues in their opposition brief, however, plaintiff
reserves the right to respond to them on reply.

14

formalistic approach to privity," the court found that the alleged employment and/or agency relationship between one or more defendants in the Epstein Action and the defendants in this action were sufficient to find that privity existed. (A926-28). The court found that any differences between the claims in the two actions were not relevant to privity (A928-29) and that those claims were or could have been asserted in the Epstein Action (A929-30). Finally, the court found that much of the evidence of fraudulent concealment proffered by Araoz was either publicly available or could have been found with due diligence, and thus did not defeat res judicata. (A930-31).

On the issue of jurisdiction, the district court stated that Araoz did not plead facts sufficient for general jurisdiction in light of the Wexners being "citizens of Ohio" and the corporate defendants' places of business being in other states, and that the complaint also lacked allegations establishing specific jurisdiction with "factual specificity." (A932).

Judgment was entered pursuant to the district court's decision on March 1, 2024 (A934) and plaintiff filed a timely notice of appeal (A935-36).

## SUMMARY OF THE ARGUMENT

1.     This action is not barred by res judicata. Although a stipulation of discontinuance does qualify as an adjudication on the merits, not all such stipulations are equal for purposes of privity. Where, as here, a prior action is

15

discontinued as the result of a release, "contractual privity, not preclusion privity" applies, and a res judicata bar exists only as to persons or entities who the parties in the prior suit specifically intended to release. See Boguslavskiy v. S. Richmond Sec., Inc., 225 F.3d 127, 130 (2d Cir. 2000). Thus, contrary to the district court's opinion, an employment or agency relationship *does not* automatically establish privity under the circumstances of this case. Moreover, not only did the defendants, who have the burden of establishing res judicata, not proffer any evidence that they were intended beneficiaries of the release in the Epstein Action, but (i) at least two courts have held that the form release which is standard in the Epstein victims' compensation program did not bar subsequent lawsuits against non-Epstein parties; and (ii) the stipulation under which Araoz agreed to participate in the compensation program explicitly stated that she was not required to release any party from which she did not receive compensation. Accordingly, the privity element of res judicata is not satisfied.

Alternatively, for the reasons set forth in plaintiff's opposition papers below, the evidence upon which she based her present claim against the Wexners and the Wexner entities was not reasonably available to her at the time of the Epstein Action. Contrary to the district court's opinion, much of the evidence through which plaintiff pieced together the Wexner-Epstein relationship either arose after the Epstein Action or, if pre-existing, remained sealed until after that action.

While the relationship between Epstein and the Wexners was not entirely unknown when the Epstein Action was litigated, the depth of that relationship and the ways in which the Wexners facilitated Epstein's crimes was much less so, and in 2019, a young girl like plaintiff Araoz could not with due diligence have assembled allegations against the Wexner defendants that met the Twombly/Iqbal threshold.

2.      The allegations of jurisdiction in the Amended Complaint are also sufficient to overcome a motion to dismiss on the pleadings. The Amended Complaint alleges that Leslie Wexner continued to control and reside in the East 71st Street property during the period complained of, that the ostensible transfer of ownership was a sham, and that through the sweeping power of attorney he gave Epstein despite knowing of Epstein's sexual propensities, Epstein, from New York, controlled his finances and used his money to perpetrate and conceal his crimes toward Araoz and others. The complaint also pleads that the Wexner business entities, too, were effectively controlled by Epstein from his New York headquarters and that Epstein freely used their resources to employ accomplices and to perpetrate and conceal his crimes.  As such, the complaint alleges far more than mere conclusory allegations of "general contacts," but instead alleges a relationship between these entities' activities in New York and the specific events complained of. Moreover, the self-serving affidavits proffered by the defense – which in any event do not deny that Epstein was an officer of the Wexner entities

17

during the relevant periods – are not sufficient to defeat jurisdiction at the pleading stage, and at most raise issues of fact for summary judgment and trial.

Alternatively, even if the Amended Complaint does not plead facts sufficient to establish jurisdiction in the Southern District of New York, dismissal need not ensue, and the proper remedy is instead to transfer venue to the Southern District of Ohio, where there is no dispute that personal jurisdiction exists. This Court has indeed found that this remedy is appropriate even if such remedy was not asked for in the papers below. See Thackurdeen v. Duke Univ., 660 Fed. App'x 43, 47 (2d Cir. 2016). To the extent that the defendants might invoke the Ohio "borrowing statute" (see Ohio. Rev. Code § 2305.03(B)), the application of that statute to claims revived under the New York Child Victims Act is not clear-cut, and in any event, the district court in Ohio would be in the best position to rule on any issues of timeliness. Therefore, this action should not have been dismissed.

## POINT I

### PLAINTIFF'S ACTION IS NOT BARRED BY RES JUDICATA

**A. Standard of Review.**

This Court "review[s] the dismissal of a complaint and the application of claim preclusion de novo." Simmons v. Trans Express, Inc., 16 F.4th 357, 360 (2d Cir. 2021); see also Computer Assocs. Int'l, Inc. v. Altai, Inc., 126 F.3d 365, 368 (2d Cir. 1997) ("We review a district court's application of the principles of res

judicata and collateral estoppel de novo").

"Under the doctrine of res judicata, or claim preclusion, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Simmons, 16 F.4th at 360, quoting St. Pierre v. Dyer, 208 F.3d 394, 399 (2d Cir. 2000). Claim preclusion applies "when (1) the identical issue necessarily was decided in the prior action and is decisive of the present action, and (2) the party to be precluded from re-litigating the issue had a full and fair opportunity to litigate the issue in the prior action." In re Hyman, 502 F.3d 61, 65 (2d Cir. 2007).

"The burden is on the party seeking to invoke res judicata to prove that the doctrine bars the second action." Computer Assocs., 126 F.3d at 369.

## B. Under the Circumstances of This Case, "Contractual Privity" Applies and the Privity Element of Res Judicata Was Not Established.

Under the above standard, the defendants did not meet their burden of proving a necessary element of res judicata, namely privity. For purposes of this appeal, Araoz does not dispute that the stipulation of discontinuance in the Epstein Action constitutes an adjudication on the merits, and therefore, could bar further litigation against the Epstein Action defendants and their privies if the other elements of res judicata are met. However, not all adjudications on the merits are created equal for purposes of determining privity, and this Court has long distinguished between "preclusion privity," which applies to the majority of res

judicata situations, and "contractual privity," which applies where – as here – the discontinuance of the prior litigation is based on a settlement and release.[10]

"As the Second Circuit has squarely held, the issue of whether a settlement agreement between a plaintiff and one party bars suit against another party is one of contractual privity, not preclusion privity." Korenblum v. Citigroup, Inc., 2015 WL 6001275, * 2 (S.D.N.Y. 2015), quoting Boguslavskiy v. S. Richmond Sec., Inc., 225 F.3d 127, 130 (2d Cir. 2000) and Esquire Trade & Fin., Inc. v. CBQ, Inc., 562 F.3d 516, 522 n.6 (2d Cir. 2009). "In other words, when, as here, a party seeks to invoke claim preclusion on the basis of its privity with a party to a [settlement

_____

[10] Plaintiff expects that defendants will contend, as they recently did in subsidiary litigation in the district court, that the issue of a release was never brought up in the underlying summary judgment papers, and that the only issue at bar in those papers was res judicata based on a stipulation of discontinuance. But that is not so. In her opposition papers below, plaintiff cited to the Doe 1 case, which involved a release. (A276). And as discussed in the Statement of Facts, plaintiff's submission of supplemental authorities to the district court included two court decisions holding that the Epstein victim compensation program's release did not bar subsequent litigation against third parties (A853-915), and in response to defendants' application to strike those authorities, plaintiff explained in detail that the reason why these decisions were relevant was that they denied res judicata in cases involving the same release that she signed. (A919). To be sure, these arguments were made in ancillary papers, but they explained specifically and clearly why the existence and scope of a release was relevant to res judicata, and thus put those issues before the district court. In any event, even if this Court were to find that plaintiff did not preserve the release issue – which she plainly did – plaintiff submits that an erroneous application of res judicata, which deprives her completely of her day in court against these defendants, is "so serious and flagrant that it goes to the very integrity of the proceeding," and is thus sufficiently "fundamental" to be reached even if unpreserved, see Taylor v. Vermont Dep't of Educ., 313 F.3d 768, 795 (2d Cir. 2002).

agreement], the usual principles of preclusion privity do not apply.  Instead, the court should apply the principles of contractual privity and apply res judicata only if the parties to the settlement agreement in the first suit *intended* to release the non-party." Id. (emphasis in original) (internal punctuation omitted), quoting Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc., 2001 WL 38285, *2 (S.D.N.Y. 2001) and citing 18 Charles A. Wright et. al., Federal Practice & Procedure § 4443, at 384 (1981).

Notably, the "contractual" in "contractual privity" refers to the release, not to any pre-existing contractual relationship between the parties. See Boguslavskiy, 225 F.3d at 130 (where party to second suit was not party to either the first suit or the settlement agreement, it is the settlement agreement that must be analyzed to determine contractual privity), citing Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 347 (1971) ("The straightforward rule is that a party releases only those other parties whom he intends to release"); see also Esquire Trade & Finance, Inc. v. CBQ, Inc., 562 F.3d 516, 522 n.6 (2d Cir. 2009) (finding that release and dismissal of prior action did not have res judicata effect where "[t]here is nothing in the present record to suggest that Esquire intended its releases of Socrates to also release CBQ, a non-party to the Socrates Action). Thus, where – as here – prior litigation is discontinued based on a release, the existence of an employment or agency relationship with the parties to this action does not

21

automatically establish privity – that is "preclusion privity," which does not apply in such circumstances. Instead, privity in this situation focuses on the specifics of the release and the intent of the releasors, and exists only where the parties to the first action intended to include the parties to the subsequent action as third-party beneficiaries of the release. See Boguslavsky, supra; Esquire, supra.

The Wexner defendants, who bear the burden of proving res judicata, did not show that they are entitled to such third-party beneficiary status. To begin with, they did not attach the release to their moving papers, and thus did not even begin to show that the language of the release includes them. In any event, as Araoz stated (A919), the release she executed is the form release for the Epstein victim compensation program in which she successfully participated, and at least two district court decisions – Doe 1 v. JPMorgan Chase Bank, N.A., 2023 WL 3945773 (S.D.N.Y. 2023) and Giuffre v. Prince Andrew, 579 F. Supp. 3d 429 (S.D.N.Y. 2022) – have held that releases in favor of Epstein, one of them that very same release, did not establish contractual privity between Epstein and the defendants in those cases.

In Giuffre, the first in time of these decisions, plaintiff Virginia Giuffre sued Epstein in Florida in May 2009, alleging that she was a victim of Epstein's sex trafficking, sexual exploitation, and child pornography offenses. See Giuffre, 579 F. Supp. 3d at 436-37. Later in 2009, Giuffre and Epstein entered into a

"Settlement Agreement and General Release" in exchange for a $500,000 payment from Epstein. Id. at 437. Thereafter, in 2021, Giuffre sued Prince Andrew for allegedly abusing her while she was being trafficked by Epstein, and Andrew sought dismissal on the ground that the 2009 settlement, resulting in the dismissal of the Florida action, was res judicata. Id.[11]

The Giuffre court characterized the settlement agreement as "far from a model of clear and concise drafting." Id. However, Prince Andrew relied upon language in the release that broadly released claims against "any other person or entity who could have been included as a potential defendant ('Other Potential Defendants') from all, and all manner of [claims]. that said First Parties ever had ... or may have, against Jeffrey Epstein, or Other Potential Defendants." Id. at 438-39. The court noted that the literal meaning of this language could be construed to release anyone and everyone, given that "[s]omeone may be included as a defendant in a lawsuit simply by including that person's name in the caption of a complaint," but that even Prince Andrew did not argue for such a broad

_____

[11] While the Giuffre court analyzed the Giuffre-Epstein settlement agreement under Florida law, the principles of Florida law that informed its analysis – namely, that ambiguities in the meaning of a contract must be resolved by a jury, that contracts should be construed when possible to give meaning to every word and phrase, and that the court should give effect to the intent of the parties, see Giuffre, 579 F. Supp. 3d at 440 – are not meaningfully different from how a New York court, or indeed a court in any American jurisdiction, would construe a similar contract.

construction. Id. at 440.

Finding instead that some level of nexus between the claims in the original lawsuit and the defendant in the second lawsuit was required, the court then considered exactly what level that nexus must be. The court specifically rejected Prince Andrew's claim that any relationship with Epstein's sexual abuse was a sufficient nexus. See id. at 441. It further noted that although the complaint mentioned "royalty" and alleged that Epstein trafficked her to "the category of royalty," the claims against Prince Andrew were of a different nature than the claims against Epstein, and that the release must be construed in light of Giuffre's likely intention of "getting as much money as she could for settling the case and keeping as much of her freedom to go after other alleged wrongdoers as she could keep while still getting an acceptable sum of money." Id. at 441-43. Thus, the court found that the intended scope of the release should be limited to "persons who could have been sued in a particular court *on a particular type of claim*." Id. at 443 (emphasis added).[12]

The court then turned to whether Prince Andrew was an intended third-party

---

[12] As additional support for this interpretation, the Giuffre court also noted that not only was Prince Andrew not named in the complaint in Giuffre's Florida action but that it was "questionable… whether the Florida court could have exercised personal jurisdiction over [Prince Andrew]." Giuffre, 579 F. Supp. 3d at 443-44. In this case, of course, the Wexners and Wexner entities have disputed personal jurisdiction in New York, and would no doubt also have done so had they been named in Araoz's Epstein Action.

beneficiary of the release, and found that the language thereof did not indicate any "clear intent" to "directly and substantially" benefit Prince Andrew. See id. at 444-48.[13] At minimum, therefore, the court found that ambiguities existed as to whether the release included Prince Andrew, which must be resolved by a jury rather than on a Rule 12 motion. See id. at 448.

In Doe 1, the plaintiff alleged – much as Araoz does here – that Epstein sexually abused and trafficked her, and that the financial support of the defendant – in that case JPMorgan Chase Bank – "was essential to Epstein's sex trafficking operation." Doe 1, 2023 WL 3945773, *1. According to the plaintiff, JPMorgan "either actually knew or should have known that it was servicing a sexual predator." Id. She sought class certification, and in opposition thereto, JPMorgan argued inter alia that any Epstein victim who had executed a release under the Epstein victim compensation program (which the court referred to as "EVCP") should be excluded from the class and deemed unable to recover. See id., *3.

The Doe 1 court disagreed, finding that although the EVCP release contained language releasing parties who "provided services to Mr. Epstein," it did

---

[13] Again, there is no meaningful difference between this analysis, which the Giuffre court conducted under Florida law, and the analysis a New York court would conduct. See, e.g., Tarrazi v. 2025 Richmond Ave. Assocs., 260 A.D.2d 468, 470 (2d Dept. 1999) (party claiming third-party beneficiary status must prove that the contract intended to confer a direct benefit upon her); Cerullo v. Aetna Cas. & Sur. Co., 41 A.D.2d 1 (4th Dept. 1973) (intent to confer third-party beneficiary status must be clear).

not, under New York law, evince a clear and definitive intent to include JPMorgan because it "[did] not specify the range or nature of services provided to Epstein that qualify a third-party… for benefits under the release." Id. The court noted that if read literally, this phrase "covers literally any person who provided services to Jeffrey Epstein, it would cover every person who gave Epstein a piano lesson, drove him in a taxi, changed his tires, or trimmed his hair," and that "it was by no means clear that the Estate of Jeffrey Epstein intended to secure protections for these hundreds of thousands of people" when it negotiated the release. Id. The court also noted that in another unreported decision involving Deutsche Bank, a similar release to the Epstein estate was not construed to include claims against defendants accused of financially supporting his crimes. See id.

In this case, as in Doe 1, the gravamen of Araoz's claims against the Wexners and the Wexner entities is that, despite knowing of Epstein's vicious sexual propensities, they provided financial support which enabled Epstein's crimes by allowing Epstein to control their vast wealth and the wealth of their entities and to use that wealth to recruit victims, hire accomplices, and cover up his conduct. The Wexners are thus in the same position vis-à-vis the Epstein compensation program release, which is the same release Araoz signed, as JPMorgan Chase Bank. Likewise, as in Giuffre, the Wexners and the Wexner entities were not sued "in [the same] particular court *on [the same] particular*

26

*claim*" as the defendants in the Epstein Action, given that the defendants in the Epstein Action were sued for their direct abuse of Araoz whereas the defendants in this action are sued for their financial enabling and negligent failure to prevent that abuse. Thus, as in Giuffre and Doe 1, the fact that Araoz released and then discontinued a prior lawsuit against Epstein and/or the Epstein estate does not establish res judicata at the pleading stage, as there are at minimum issues of fact as to whether the release establishes the necessary privity between the defendants in the Epstein Action and the Wexners.

The conclusions of Doe 1 and Giuffre are further supported by the stipulation in which Araoz agreed to take part in the Epstein compensation program in the first place, which is part of the state court record in the Epstein Action and of which this Court may take judicial notice, see Williams v. New York City Housing Auth., 816 Fed. App'x 532, 534 (2d Cir. 2020). That stipulation contemplated the likelihood that participation in the program would lead to a release and discontinuance of the lawsuit, and stated that "nothing herein requires Plaintiff to discontinue this action as against any Defendants whom she does not release via the Program." In other words, Araoz reserved the right to sue, or continue to sue, anyone from whom she did not receive compensation via her program participation. This further supports the conclusion that she did not intend to release parties like the Wexners from whom she had not received compensation

27

at the time and whose liability she did not even know of at that point.

This Court should therefore find that, under the "contractual privity" standard that applies under the circumstances of this case, defendants-appellees did not establish privity and therefore did not establish entitlement to dismissal on res judicata grounds. The Wexners and Wexner entities remain free to "introduce[e] further evidence in support of [their] interpretation of the [release] at a later stage of this case, such as summary judgment or trial," Doe 1, 2023 WL 3945773, *4 n.5, but they cannot prevail on that issue at the pleading stage.

## C. Alternatively, the Factual Basis of This Action Was Not Available with Reasonable Diligence in 2019.

Alternatively, if this Court finds that privity conclusively existed between the defendants in the Epstein Action and the defendants in this action – which it did not – then it should find, for the reasons stated in the plaintiff's opposition papers below, that the facts underlying her claims in this case were either fraudulently concealed or not available to her with reasonable diligence.

Even where a lawsuit would otherwise be barred by res judicata, it may be pursued if it is based on new evidence that was either (1) fraudulently concealed, or (2) could not have been obtained with due diligence. In re Layo, 460 F.3d 289, 292 (2d Cir. 2006). The governing question is whether the claims in the second lawsuit "could have been brought *at the same time*," Brown v. Quiniou, 2003 U.S. Dist. LEXIS 6257, *9 (S.D.N.Y. 2003) (emphasis added), which in this case, given

28

the timing of the Epstein Action, is August 2019.

In this case, as detailed in the Affirmation of Robert J. Hantman in opposition to the underlying motion (A302-12) and in the exhibits and articles cited therein, the gravamen of Araoz's claims against the Wexners was concealed and/or not reasonably available to her in August 2019, or even July 2020 when she agreed to participate in the Epstein victim compensation program. To be sure, it was public knowledge at that time that a relationship existed between Epstein and the Wexners and that Epstein managed the Wexners' money (as he did for many other wealthy clients), and public filings also showed that Epstein was an officer of several Wexner-related business and nonprofit entities. But the full extent of the Epstein-Wexner relationship, including that Wexner had been specifically informed of Epstein's propensities as early as 1986; that certain "donations" to the Wexner charities had all the appearances of being sham purchases and money-laundering transactions; that Epstein actually used the Wexner entities to pay his recruiters and accomplices; how Epstein was given a sweeping power of attorney that effectively let him use the Wexners' billions as he wished; and how the Wexners actually facilitated Epstein's sexual abuse of minors at their home, was unknown until a late July 2019 New York Times expose (cited and linked at page 303 of the Appendix), an October 2019 Washington Post article (cited and linked at page 305), a deeply reported Vanity Fair article in 2021 (cited and linked at page

302), a blockbuster 2022 Daily Mail interview where Epstein accomplices actually said "We work for Les Wexner" (cited and linked at pages 305-06), and 2022 television documentaries (cited and linked at page 310).

The Hantman affidavit also showed how the Wexners themselves worked to conceal any mention of their name in connection with Epstein, for instance, securing the sealing of a deposition given by Virginia Giuffre in 2016 which "probed the relationship between Wexner, Epstein, and the [71st Street] Property." (A306-07). This transcript was unsealed only in July 2020, and a redacted name therein was connected to Wexner only by a Business Insider article appearing in October 2020. (A306-07). In that and other lawsuits, Wexner's legal team appeared and successfully sought sealing and/or protective orders of testimony and documents bearing Wexner's name. (A307-08). Although the links between the Wexners and Epstein's sexual crimes were discussed privately among counsel as early as 2014 (A309), these communications did not become public knowledge until much later when they were testified to at depositions and when those depositions were unsealed (A309).

It is certainly understandable why the Wexners would have exercised their considerable wealth and legal resources to conceal their knowledge and facilitation of Epstein's sex crimes from the public. But they should not then be able to turn around and say that this information was or should have been known to Araoz

30

when she sued the Epstein estate in 2019. A comparison of the pre-2019 sources referred to at pages 302-12 of the deposition with the sources that appeared or were unsealed after July 2019 clearly shows the paucity of information that would have been available to Araoz had she sued the Wexners in July 2019 as compared to the detailed information available when she initiated this case, and also shows that she could not, with due diligence, have drafted a Twombly/Iqbal-compliant pleading against the Wexners without that information.

The record also shows that Araoz did exercise diligence. As discussed in the Statement of Facts, the initial complaint in her Epstein Action named only the Epstein estate and Ghislaine Maxwell as defendants, but the amended complaint in that action named a host of other Epstein-owned trusts and entities as well as accomplices employed by Epstein. Clearly, Araoz did her homework between the initial complaint and the amended complaint and made a good-faith attempt to discover the entities who might be liable for her abuse. But due diligence does not mean perfect diligence, see In re Lavender, 399 Fed. App'x 649, 652 (2d Cir. 2010); accord Fed. Housing Fin. Agcy. v. Nomura Holding America, Inc., 873 F.3d 85, 121 (2d Cir. 2017) ("due diligence processes are never perfect"). Instead, New York defines due diligence as "such a measure of prudence, activity, or assiduity, as is properly to be expected from, and ordinarily exercised by, a reasonable and prudent man under the particular circumstances; not measured by

31

any absolute standard, but depending on the relative facts of the special case."
People v. Chi Keung Seto, 182 Misc. 2d 255, 260 (Sup. Ct., N.Y. Co. 1994),
quoting Black's Law Dictionary 457 (6th ed. 1990).  The fact that Araoz's diligence
in 2019 did not turn up the information that the Wexners had worked so hard to
conceal and that was not exposed to public knowledge until later was, under the
circumstances of this case, entirely excusable, and thus defeats res judicata.

Finally, Araoz again points out, as she did below, that the nature of her
claims against the defendants in this case is different from that of her claims in the
Epstein Action; the prior action focused on the direct abuse she suffered, whereas
the claims in this case relate to enabling and negligent supervision.  As plaintiff
made clear to the district court, the New York Child Victims Act, under which she
sued, was created to seek justice against abusers "and the institutions who may
have harbored them," see LG 67 Doe v. Resurrection Lutheran Church, 75 Misc.
3d 327 (Sup. Ct., Erie Co. 2022), and the defendants in this case are alleged to be
precisely such "harborers."  Ultimately, res judicata is a prudential doctrine, and
applying it here to members of the very class of people that the CVA was intended
to allow plaintiffs like Araoz to sue, would be the very opposite of prudence.
Thus, for all the above reasons, this Court should find that the district court's
dismissal of this lawsuit on res judicata grounds was in error.

## POINT II

**THE COMPLAINT PLED FACTS SUFFICIENT TO ESTABLISH PERSONAL JURISDICTION AT THE PLEADING STAGE; ALTERNATIVELY, THE APPROPRIATE REMEDY SHOULD BE TO TRANSFER VENUE TO THE SOUTHERN DISTRICT OF OHIO WHERE PERSONAL JURISDICTION INDISPUTABLY EXISTS**

### A. Standard of Review.

This Court's review of a district court's decision to dismiss a complaint for lack of personal jurisdiction is de novo. Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 163 (2d Cir. 2010). At the pleading stage, "[p]laintiffs need only raise a prima facie showing of personal jurisdiction over the defendant[s], and [this Court] construe[s] the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." Id. (cleaned up), quoting Porina v. Marward Shipping Co., 521 F.3d 122, 126 (2d Cir. 2008).

Personal jurisdiction may be general or specific. See Daimler AG v. Bauman, 571 U.S. 117, 127 (2014), citing Int'l Shoe Co. v. State of Washington, 326 U.S. 310, 318 (1945). General jurisdiction over a corporation exists where its affiliations with the state in which they are sued as "so continuous and systematic as to render them essentially at home in the forum [s]tate." Id. As to individual defendants, "the paradigm forum for the exercise of general jurisdiction is the individual's domicile." Goodyear Dunlop Tires Operations, S.A. v. Brown, 564

U.S. 915, 924 (2011).

Specific jurisdiction, in a diversity action, "is governed by the law of the state in which the court sits and by the limits of due process." Prince v. The Intercept, 634 F. Supp. 3d 114, 128 (S.D.N.Y. 2022). To determine whether specific jurisdiction exists, this Court first looks to New York State's long-arm statute, i.e., CPLR § 302(a), and if jurisdiction is appropriate thereunder, must then ascertain whether the exercise of jurisdiction comports with due process. See id.

**B.    The Amended Complaint Sufficiently Pleads Personal Jurisdiction.**

In this case, the allegations of the Amended Complaint, taken as true and construed liberally as required by Chloe and Porina, supra, are amply sufficient to set forth a prima facie case of specific jurisdiction against the Wexners and their related entities.  At the outset, the district court's doubt that plaintiff was invoking specific jurisdiction because she "used the language of general jurisdiction" (A931) is misplaced. As the Supreme Court has recently observed, "[s]ince International Shoe, specific jurisdiction has become the centerpiece of modern jurisdiction theory, while general jurisdiction has placed a reduced role." Daimler, 571 U.S. at 128. This means that, ordinarily, any invocation of personal jurisdiction in a diversity case will include specific jurisdiction as the default. Moreover, while the Amended Complaint does contain some language such as "generally at home" and "fair measure of permanence" that is suggestive of

general jurisdiction, it also contains detailed facts as to the manner in which the defendants resided in New York, transacted business in New York, and/or were controlled from New York in connection with aiding and abetting Epstein's criminal activities. (A179-81). Thus, construing the allegations of the Amended Complaint in the light most favorable to Araoz and resolving all doubts in her favor as this Court must, the Amended Complaint does invoke specific as well as general jurisdiction.

Turning to the elements of specific jurisdiction in New York, the first step – examination of the New York long-arm statute – is predicated on Section 302(a) of the New York Civil Practice Law and Rules. Under this statute, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:"

> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or
>
> 2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or
>
> 3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he
>
>     (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed

35

or services rendered, in the state, or

    (ii)    expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or

    4.    owns, uses or possesses any real property situated within the state.

In this case, the Amended Complaint sets forth facts sufficient to establish prima facie personal jurisdiction against the defendants under all four sections of the statute as to Leslie Wexner, Sections 2, 3 and 4 as to Abigail Wexner, and Sections 1, 2, and 4 as to the Wexner entities.

As to paragraph 1 – transaction of business in New York – a cause of action arises from "a party's activities in New York if there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York." Henderson v. INS, 157 F.3d 106, 123 (2d Cir. 1998). Although "not every conceivable connection to a New York transaction is substantial enough to confer jurisdiction," the inquiry under CPLR § 302(a)(1) "is relatively permissive." Daou v. BLC Bank, S.A.L., 42 F.4th 120, 130 (2d Cir. 2022), quoting Licci v. Lebanese Canadian Bank, 20 N.Y.3d 327, 339 (2012).

As to Leslie Wexner, Araoz's pleadings allege that he knew full well of Epstein's sexual propensities and, notwithstanding that knowledge, conducted transactions with Epstein in New York, including giving Epstein a sweeping power

of attorney to control his wealth, giving Epstein free rein to use and control a property in New York for the purposes of recruiting and trafficking his victims, and paying Epstein's accomplices. Likewise, Araoz's pleadings allege that the Wexner entities were effectively operated from New York by Epstein and that their funds were used by Epstein, in New York, to hire and pay accomplices and to finance and conceal his crimes.

These transactions all bear a "substantial" relationship to the acts that Araoz complains of – indeed, it is alleged in the complaint that these transactions directly enabled and contributed to those very acts. This is not a case in which Araoz seeks to sue the Wexners in New York based on business activities having little or nothing to do with Epstein's sex crimes; instead, as in Doe 1, supra, the gravamen of the complaint is that those transactions contributed directly to those crimes.

Likewise, as to CPLR § 302(a)(2), which applies when the defendant *in person or through an agent* commits a tortious act within the State of New York, the complaint alleges that Epstein, through his power of attorney, acted as Wexner's agent in using Wexner's wealth to commit tortious acts in New York; that Epstein, as an officer of the Wexner entities, also had such an agency relationship with them; and indeed, that the accomplices who recruited and helped in the abuse of Araoz stated that they worked for the Wexners (which would include Abigail as well as Leslie). Notably, this Court's decision in Edwardo v.

37

Roman Catholic Bishop of Providence, 66 F.4th 69 (2d Cir. 2023), cited by the defendants in their supplemental authority submission, to the contrary. The key facts on which the Edwardo decision turned were that (i) the Diocese of Providence did not know that one of its priests intended to sexually molest the plaintiff during a single trip that he took to New York; and (ii) that the priest was not acting as an agent of the Diocese when he conducted such molestation. See id. at 74-75. In this case, the complaint pleads that the Wexners did know of Epstein's criminal propensities, and that they financed him and gave him the use of real estate and employees despite knowing that he would use such money, property, and employees to commit sex trafficking, obtaining in turn the benefit of his money management and other services. Hence, the issue of whether an agency relationship existed sufficient to confer personal jurisdiction in New York based on Epstein's torts cannot be determined at the pleading stage sufficient to allow dismissal.

Third, the complaint pleads that the Wexners "commit[ted] a tortious act without the state causing injury to person or property within the state," see CPLR § 302(a)(3). This section applies to, *inter alia*, out-of-state negligence that the defendant could reasonably expect to have consequences in New York. See, e.g., Allen v. Institute for Family Health, 159 A.D.3d 554 (1st Dept. 2018), citing Ingraham v. Carroll, 90 N.Y.2d 592, 598 (1997). In this case, the complaint alleges

that the Wexners, knowing of Epstein's sexual propensities and knowing that he had free use of their money and property, negligently retained him and negligently failed to supervise his activities in New York so as to prevent his sex crimes, which is obviously a type of negligence that would reasonably be expected to have consequences in New York. The complaint indeed pleads that Araoz suffered those very consequences.

Fourth, CPLR § 302(a)(4) applies where injury was suffered through the defendants' use, control and/or ownership of real property in New York, and the complaint alleges that the Wexners and the Wexner entities owned and/or controlled the East 71st Street mansion where she was abused but failed to take reasonable measures to prevent such abuse. See, e.g., Jacqueline S. v. City of New York, 81 N.Y.2d 288 (1993) (discussing liability of property owners in the context of, *inter alia*, rape and sexual abuse). Plaintiff is certainly aware that the Wexners contest this and deny that they had any remaining connection with the property in 2001-02. But as detailed in the Statement of Facts, this denial is based on self-serving affidavits and documents which are shown in the Simon affirmation to be inadequate and incomplete. While personal jurisdiction under CPLR § 302(a)(4) may be the subject of a summary judgment motion at a later date, it cannot be ruled out at the pleading stage.

Finally, personal jurisdiction in New York plainly comports with due

process. The federal due process considerations applicable to personal jurisdiction are twofold: minimum contacts and reasonableness. See Chloe v. Queen Bee Beverly Hills, LLC, 616 F.3d 158, 164 (2d Cir. 2010). Minimum contacts requires determination of "whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction." Id. Reasonableness involves an inquiry into "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." Id., citing Asahi Metal Indus. Co. v. Superior Ct. of California, 480 U.S. 102, 113-14 (1987).

In this case, minimum contacts are shown by, *inter alia*, the following: Leslie and Abigail Wexner giving Epstein, in New York, a power of attorney which allowed him to manage their wealth from New York; the Wexner entities employing Epstein as an officer and enabling Epstein to effectively exercise control over them from New York; the use of Wexner money to pay Epstein's sex trafficking accomplices in New York; and the defendants' knowing allowance of Epstein to obtain and use New York property to commit his crimes. And as to reasonableness, (1) Wexner, who has six billion dollars, will face no hardship

40

whatsoever defending a federal lawsuit in New York; (2) New York has a great interest in protecting the victims of sexual abuse within its borders, as shown by the very enactment of the Child Victims Act to facilitate suits by such victims; (3) Araoz, as a victim of child sexual abuse who lives in New York and was abused in New York, has a compelling interest in obtaining "convenient and effective relief" there; (4) the most efficient resolution of this case would be in New York, where much of the evidence and many of the witnesses are located; and (5) the shared interest of the states lies in furthering the social policy of compensating minors who were sexually abused. This Court should therefore find that at the pleading stage – where, again, plaintiff need only allege jurisdiction prima facie – there is a sufficient basis to exercise personal jurisdiction over all the defendants in the Eastern District of New York.

**C. Alternatively, Transfer to the Southern District of Ohio is Appropriate.**

Even if this Court were to determine that the Amended Complaint does not plead personal jurisdiction prima facie – which it does, see Point II(B) – such a determination would still not require dismissal. This lawsuit began in state court, but the defendants themselves availed themselves of the federal court system by removing it to the Eastern District of New York. And in the federal system where lawsuits can be transferred between districts in different states, "jurisdiction" in a given state is really a matter of venue.

Consistent with the nature of the federal system, this Court has held that, where the defendants in a federal action do not have a sufficient nexus to the state where it is initiated, the courts have "statutory and inherent authority to transfer [the] case directly to an appropriate district court if doing so would be in the interest of justice." Thackurdeen v. Duke Univ., 660 Fed. App'x 43, 47 (2d Cir. 2016), citing Minette v. Time Warner, 997 F.3d 1023, 1026 (2d Cir. 1993) and Bolar v. Frank, 938 F.2d 377, 379-80 (2d Cir. 1991).  In fact, the circuit court may transfer the case in lieu of dismissal even if such relief is not sought in the district court. See Thackurdeen, supra.

In this case, again assuming *arguendo* that personal jurisdiction does not lie in New York, the interests of justice would favor transfer rather than dismissal. Plaintiff Araoz is a young woman who was sexually molested by Jeffrey Epstein while still a minor and who now seeks to hold to account the persons and entities who, by giving Epstein control of their enormous wealth and corporate resources despite knowing of his propensities, enabled him to carry out and cover up his crimes.  Moreover, it was not unreasonable for Araoz to initiate the action in New York.  It is undisputed that the Wexners owned the 71st Street property at one point, although their continued ties to it at the time of the events complained of are contested, and just as importantly, it appears to be uncontested that Epstein, *while located in New York*, was an officer of the Wexner entities and made use of those

42

entities to employ accomplices in New York and facilitate his crimes in New York. Even if Araoz was wrong to initiate this case in New York (which she was not), it was not frivolous for her to do so.

The courts, as recognized in cases such as <u>Thackurdeen</u>, do not take a punitive attitude toward personal jurisdiction – which, after all, has nothing to do with the merits of the case – and are reluctant to throw a plaintiff out of court simply because she sued in the wrong state. In this case, where it was not facially unreasonable for Araoz to sue in New York, such a drastic consequence should not ensue. And although transfer to the Southern District of Ohio was not asked for below, the <u>Thakurdeen</u> case shows that even this is not an obstacle.

Finally, in recent subsidiary litigation in the district court, the defendants have suggested that any transfer to the Southern District of Ohio would be futile because that court would apply Ohio's "borrowing" statute, Ohio Res. Code § 2305.03(B), under which the shorter of the Ohio or New York statute of limitations would apply. Granting that the Ohio district court would treat the statute of limitations as procedural rather than substantive in nature, thus applying the law of the forum state, <u>see, e.g.</u>, <u>Phelps v. McClellan</u>, 30 F.3d 658, 661 (6th Cir. 1994), the applicability of the borrowing statute is complicated by (i) the fact that Araoz's claims accrued during the period between 1965 and 2005 when Ohio did not have a borrowing statute, <u>see</u> <u>Cole v. Miletti</u>, 133 F.3d 433, 436-37 (6th Cir. 1998)

(discussing the 1965 repeal); 2004 Ohio Laws File 144 (reinstating the borrowing statute effective April 7, 2005); and (ii) the fact that research does not reveal any case in which the Ohio courts have determined the interplay between the borrowing statute and a sister-state law explicitly intended to revive claims that arose in that state. Plaintiff submits that this Court is, in any event, not the proper forum to resolve disputes about timeliness under Ohio law and that any such issues would be appropriately litigated before the Southern District of Ohio on remand. Thus, if this Court finds that plaintiff did not sufficiently plead jurisdiction in the Amended Complaint (which she did), it should not let the possibility of further litigation deter it from transferring venue to the Southern District of Ohio in lieu of dismissal.

## **CONCLUSION**

In light of the foregoing, this Court should reverse the district court's order and judgment, reinstate plaintiff-appellant Araoz's claims, remand for further proceedings in the Eastern District of New York or alternatively the Southern District of Ohio, and grant such other and further relief to plaintiff-appellant as it may deem just and proper.

Dated:    New York, NY
           May 10, 2024

                        /s/ Jonathan I. Edelstein
                        JONATHAN I. EDELSTEIN

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies pursuant to Fed. R. App. Pro. 32(a)(7)(C) as follows:

1.    This brief complies with the type-volume limitation of Fed. R. App. Pro. 32(a)(7)(B), as modified by Second Circuit Rule 32.1(a)(4)(A), because it contains 11,092 words exclusive of those parts of the brief exempted by Fed. R. App. Pro. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. Pro. 32(a)(5) and the type style requirements of Fed. R. App. Pro. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office 2016 in Times New Roman 14-point type.

Dated:    New York, NY
            May 10, 2024

                                 /s/ Jonathan I. Edelstein
                                 JONATHAN I. EDELSTEIN

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                              :
**JENNIFER D. ARAOZ**,                                        :
                                                              :
                              Plaintiff,                      :
                                                              :   **MEMORANDUM DECISION AND**
                – against –                                   :   **ORDER**
                                                              :
                                                              :   22-CV-0125 (AMD) (RML)
**THE NEW ALBANY COMPANY, LLC**, et al.,                      :
                                                              :
                              Defendants.                     :
                                                              :
------------------------------------------------------------ X

**ANN M. DONNELLY**, United States District Judge:

Before the Court is the defendants' motion to dismiss.  For the reasons explained below,

the motion is granted.

The plaintiff claims that Jeffrey Epstein repeatedly sexually assaulted and eventually

raped her when she was a minor.  The plaintiff alleges that the defendants collectively owned the

building where the assaults occurred, and that the defendants allowed the abuse to continue by

supporting Epstein social and financially, allowing him to live and work in the building, and

allowing him to use the defendants' employees for his own purposes.

The plaintiff previously brought claims against Epstein's estate in New York state court,

premised on the same underlying facts as this case, which were dismissed with prejudice.  She

alleges now that the defendants in this action employed the defendants whom the plaintiff sued

in the prior state action.

**SA1**

# BACKGROUND

## I.     Factual Background

The plaintiff alleges that beginning in 2001, Jeffrey Epstein[1] repeatedly sexually

assaulted and eventually raped her when she was a minor, at Nine East 71st Street, New York,

New York ("the Property").  (ECF No. 36 ¶¶ 5–7.)[2]  She further alleges that the defendant Leslie

Wexner owned the Property "where[,] despite having notice of Epstein's behavior, he permitted

Epstein to live and run his companies and nonprofit organizations," and that Epstein was

"enabled . . . to perpetuate these sexual crimes against her" "with the help of Leslie and Abigail

Wexner, and a network of charities, companies, [] trusts, and their employees."  (*Id.*)

## II.    Prior State Court Action

In 2019, the plaintiff brought a lawsuit in the Supreme Court of the State of New York

and made similar claims arising out of the same set of facts against multiple defendants,

including Jeffrey Epstein's estate and its executors and Ghislaine Maxwell.  (ECF No. 40-3

(State Action First Amended Complaint).)  None of the defendants in that lawsuit are parties to

this suit.  In the state court lawsuit, the plaintiff alleged that the Nine East 71st Street Corporation

owned and operated the Property.  (*Id.*)  In November 2020, the plaintiff entered a stipulation of

---

[1] Epstein's indictment was unsealed on July 8, 2019.  Indictment, *United States of America v. Jeffrey Epstein*, No. 19-CR-490 (S.D.N.Y. July 2, 2019).  Epstein died of an apparent suicide while in pretrial detention.  Letter, *Epstein*, No. 19-CR-490 (S.D.N.Y. Aug. 14, 2019).

[2] The plaintiff brings her claims under New York's Child Victims Act, N.Y. C.P.L.R. § 214-g, which went into effect on August 14, 2019, and gave victims of child sexual abuse a one-year "look-back" window to sue an alleged abuser and the individuals and institutions that allegedly aided them, regardless of when the crime occurred.  The window was later extended to August 14, 2021, the date the plaintiff filed this lawsuit.

**SA2**

discontinuance in which she agreed to dismiss the state court action with prejudice.  (ECF No. 40-4 (State Action Stipulation of Discontinuance).)

## III.   Federal Action Procedural Background

On August 14, 2021, the plaintiff, then *pro se*, brought this action in state court against six defendants: The New Albany Company, LLC, the YLK Charitable Fund, the Wexner Family Charitable Fund, the Wexner Foundation, and Leslie Wexner and Abigail Wexner (collectively "the defendants").  (ECF No. 1.)  The defendants removed this action to federal court on January 7, 2022, on the basis of diversity jurisdiction.  (*Id.*)  At the time of removal, the plaintiff had filed only a notice with summons; she had not filed a complaint.  (*Id.*)

At Magistrate Judge Robert Levy's direction, the plaintiff filed a complaint on June 29, 2022 in this Court.  (ECF No. 22.)[3]  The plaintiff filed an amended complaint—the operative pleading for resolution of this motion—on January 6, 2023.  (ECF No. 36.)  The plaintiff asserts seven causes of action: (1) a declaratory judgment claim regarding ownership of the property; (2) a negligence claim for premises liability against Leslie Wexner; (3) a negligence claim against all of the defendants; (4) a negligent retention claim against the Wexner Family Charitable Fund, the Wexner Foundation, Leslie Wexner, and the New Albany Company for hiring employees who caused the sexual abuse of the plaintiff; (5) a fraudulent conveyance claim against Leslie Wexner, Abigail Wexner, YLK Charitable Trust, the Wexner Family Charitable Fund, and the Wexner Foundation; (6) an aiding and abetting claim against Leslie Wexner, the Wexner Family Charitable Fund, the Wexner Foundation, and the New Albany Company; (7) a conspiracy claim against Leslie Wexner, the Wexner Family Charitable Fund, the Wexner Foundation, and the New Albany Company; and (8) an intentional infliction of emotional

---

[3] The plaintiff eventually retained counsel.

## SA3

distress claim against the Wexner Family Charitable Fund, the Wexner Foundation, Leslie H. Wexner and the New Albany Company, LLC. (ECF No. 36.)[4]

The defendants moved to dismiss the plaintiff's amended complaint in its entirety on April 17, 2023. (ECF No. 40.) The defendants argue that the plaintiff's claims are barred by *res judicata* because the plaintiff already litigated her claims, which arise from the same facts, and the claims were dismissed with prejudice. (*Id.* at 18–23.) The defendants cite various other pleading deficiencies: (1) the plaintiff did not allege facts that would allow personal jurisdiction over any defendant; (2) the plaintiff has no standing to assert a claim of declaratory relief; (3) the plaintiff engaged in impermissible group pleading; (4) the complaint fails to state a claim against the defendant New Albany Company, LLC; (5) the plaintiff's conspiracy claim fails as a matter of law; (6) the plaintiff's fraudulent conveyance claim is untimely and fails on the merits; and (7) the plaintiff did not state a claim against the defendants for negligent retention. (ECF No. 40.)

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "[a] pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Id.*

---

[4] The first seven claims were also raised in the original complaint. (ECF No. 1.)

(quoting *Twombly*, 550 U.S. at 555). Pleadings are construed in the light most favorable to the

plaintiff. *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010).

## DISCUSSION

The defendants raise multiple arguments for dismissal. The Court first addresses the

defendants' *res judicata* argument—that the dismissal with prejudice of the plaintiff's state

action bars this action. The Court concludes that it does.

"*Res judicata*, or claim preclusion, dictates that 'a final judgment on the merits in one

action bars subsequent relitigation of the same claim by the same parties.'" *Toth v. New York*

*City Dep't of Educ.*, No. 21-CV-4245, 2023 WL 121733, at *4 (E.D.N.Y. Jan. 5, 2023) (quoting

*Greenberg v. Bd. of Governors of Fed. Rsrv. Sys.*, 968 F.2d 164, 168 (2d Cir. 1992)); *Monahan*

*v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000) ("The doctrine of *res judicata,* or

claim preclusion, holds that a final judgment on the merits of an action precludes the parties or

their privies from relitigating issues that were or could have been raised in that action." (internal

quotations omitted)).[5] The party raising the *res judicata* defense—here, the defendants—must

show that "(1) the previous action involved an adjudication on the merits; (2) the previous action

involved the [parties] or those in privity with them; [and] (3) the claims asserted in the

subsequent action were, or could have been, raised in the prior action." *Monahan*, 214 F.3d at

285.[6]

---

[5] Because the plaintiff stipulated to dismiss the New York state court case, the Court applies New York
law in determining the preclusive effect of that prior proceeding. *See Allianz Ins. Co. v. Lerner*, 296 F.
Supp. 2d 417, 421 (E.D.N.Y. 2003), *aff'd*, 416 F.3d 109 (2d Cir. 2005). Federal case law is instructive,
however, because "New York and federal res judicata doctrines are 'virtually identical.'" *Umar*
*Oriental Rugs, Inc. v. Carlson & Carlson, Inc.*, 757 F. Supp. 2d 218, 223 n.2 (E.D.N.Y. 2010) (citation
omitted).

[6] "A court may consider a res judicata defense on a Rule 12(b)(6) motion to dismiss when the court's
inquiry is limited to the plaintiff's complaint, documents attached or incorporated therein, and materials
appropriate for judicial notice." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 498 (2d Cir. 2014).

**SA5**

I.      Adjudication on the Merits

With respect to the first element, "it has long been settled that a stipulation of dismissal with prejudice is an adjudication on the merits." *Toth*, 2023 WL 121733, at *4 (internal quotation marks and alterations omitted).  The stipulation of discontinuance the plaintiff entered in the state court action, dismissing the action with prejudice (ECF No. 40-4), thus satisfies the first element of *res judicata* as an adjudication on the merits.

II.     Involving the Parties or Their Privies

The second element is also met, as the previous state action involved the same parties or their privies.  Both New York and federal courts have rejected a "formalistic approach" to privity, considering instead whether the new defendants share an interest with those named in the first action.  *Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 346 (2d Cir. 1995); *Sweeper v. Tavera*, No. 08-CV-6372, 2009 WL 2999702, at *4 (S.D.N.Y. Sept. 21, 2009) ("[I]t is well-settled in this Circuit that literal privity is not a requirement for *res judicata* to apply. . . . [A] privity analysis for *res judicata* purposes is broader than a traditional privity analysis." (internal citations and quotation marks omitted)).

"[A]n employer-employee or agent-[principal] relationship will provide the necessary privity for claim preclusion with respect to matters within the scope of the relationship, no matter which party is first sued." *Quattrone v. Erie 2 Chautauqua-Cattaraugus Bd. of Coop. Educ. Servs.*, No. 19-CV-1329, 2021 WL 4295418, at *5 (W.D.N.Y. Sept. 21, 2021) (internal quotation marks omitted); *see also Bayer v. City of New York*, 115 A.D.3d 897, 897–99 (2d Dep't 2014) ("Although [certain parties] were not named in the [prior] action, since they are employees of the

---

The complaint and stipulation of dismissal from the plaintiff's state court action are court records, which "are a matter of public record of which this Court [may] take[] judicial notice."  *Magi XXI, Inc. v. Stato Della Cit%22a Del Vaticano*, 22 F. Supp. 3d 195, 201 (E.D.N.Y. 2014).

**SA6**

Department whose conduct formed the basis of the plaintiff's allegations in the [prior] action,
they are entitled to rely upon the beneficial disposition of the [prior] action against the City and
the Department." (citation omitted)).

In the state court action, the plaintiff sued defendants who are not parties in this action;
however, the allegations in the federal complaint, if true, establish that each defendant the
plaintiff now sues is in privity with at least one of the defendants in the prior state action.  In
general, the plaintiff alleges that the defendants in this action employed some of the defendants
in the state action and that the defendants' alleged liability in this action stems from this
employer-employee relationship—a privity relationship sufficient for purposes of *res judicata*.

More specifically, the complaint alleges a privity relationship for each defendant in this
action with at least one defendant in the earlier state action:

- **The New Albany Company, LLC**:  The plaintiff's complaint alleges that
  "[u]pon information and belief, New Albany [] employed Epstein and the
  Employees that materially aided Epstein in his crimes and cover ups."  (ECF No.
  36 ¶43.)  Epstein's estate was a defendant in the prior state action.  (*See* ECF No.
  40-3.)

- **The Wexner Family Charitable Fund**:  The plaintiff alleges that the Wexner
  Family Charitable Fund "also employed Epstein and the Employees that
  materially aided Epstein in his crimes and cover ups."  (ECF No. 36 ¶ 48.)

- **The YLK Charitable Fund**:  The plaintiff alleges "[u]pon information and
  belief[,] the YLK Charitable Fund also employed Epstein and the Employees that
  materially aided Epstein in his crimes and cover ups."  (*Id.* ¶ 45.)

- **Abigail Wexner**:  The plaintiff alleges that Ms. Wexner was the president and
  director of the YLK Charitable fund (*id.* ¶ 12), the director of the Wexner Family
  Charitable Fund and the Wexner Foundation (*id.*), and that her and her husband
  Leslie Wexner's "employees directly and materially aided Jeffrey Epstein in
  perpetrating crimes of sexual abuse, sexual assault, and rape against Ms. Araoz"
  (*id.* ¶ 9).

- **The Wexner Foundation**:  The plaintiff alleges that "[u]pon information and
  belief the Wexner Foundation also employed Employees that materially aided
  Epstein in his crimes and cover ups."  (*Id.* ¶ 51.)  In another part of the complaint,
  the plaintiff alleges upon information and belief that the Foundation, along with
  some of the other defendants in this action, employed an individual referred to as

**SA7**

"the Recruiter."  (*Id.* ¶ 101.)  "The Recruiter" appears to refer to the defendant named as Jane Doe 1 in the prior state action.  (*Compare id.* ¶¶ 99–115, *with* ECF No. 40-3 ¶¶ 88–109.)

- **Leslie Wexner**:  The plaintiff alleges that Epstein "was an officer, director, or employee of many corporate entities and trusts controlled by Leslie Wexner, and Defendants in this action," and, more specifically, that Epstein was employed as "Leslie Wexner's financial manager."  (ECF No. 36 ¶¶ 20, 61.)[7]  The plaintiff also alleges that Leslie Wexner owned a corporation named as a defendant in the prior state action (but not this federal action), Nine East 71st Street Corporation.  (*Id.* ¶ 63; ECF No. 40-3.)[8]

These allegations allege an employer-employee or agent-principal relationship sufficient to "provide the necessary privity for claim preclusion" for each defendant in this federal action.  *Quattrone*, 2021 WL 4295418, at *5.[9]

The plaintiff does not deny or dispute the employer-employee privity relationship alleged in the complaint.  Rather, she argues that the defendants in this action are "distinct from those in the State Action," "the causes of action in this lawsuit rely upon entirely different facts as those in the State Action," the "Defendants are independently liable for their own negligent and intentional acts that led to the sexual assaults that occurred on the Property," and the "[l]iability for Mr. Epstein's entities listed in the State Action involve completely different questions of fact, which resolved the direct responsibility for the assaults, and thus does not have bearing on Mr.

---

[7] The plaintiff also alleges that, upon information and belief, some of the defendants in the earlier state action—"the Maid, Ms. Fontanilla, and Ms. Leslie Groff"—were "employees of the Defendants" in this action (ECF No. 36 ¶ 117), although she does not specify which defendants in this action she alleges employed those individuals.

[8] Under New York law, privity also exists between corporate defendants and parties who are "officers, shareholders and/or owners of defendant corporation[s]."  *Briggs v. Chapman*, 53 A.D.3d 900, 863 (3d Dep't 2008).

[9] Moreover, the plaintiff alleges that the defendants Leslie Wexner, Abigail Wexner, and the YLK Charitable Fund owned the Property where the sexual abuse occurred and were successors in interest to the Nine East 71st Street Corporation.  (ECF No. 36 ¶¶ 39, 40, 44.)  In the prior state action, she named the Nine East 71st Street Corporation as a defendant.  (ECF No. 40-3.)  Under New York law, privity also extends to those who are "successors to a property interest."  *Nath v. Select Portfolio Servicing, Inc.*, No. 15-CV-8183, 2017 WL 782914, at *10 (S.D.N.Y. Feb. 28, 2017), *aff'd*, 732 F. App'x 85 (2d Cir. 2018).

**SA8**

Wexner's negligence and intentional actions and his failure to supervise his own companies, properties, and employees." (ECF No. 42 at 17–18.)

None of these arguments are persuasive or relevant. It does not matter, for instance, that the plaintiff previously brought sexual assault and battery claims against the executors of Epstein's estate, and now brings a claim under a different legal theory—negligent supervision—against Leslie Wexner. "[A]n employer-employee or agent-[principal] relationship will provide the necessary privity for claim preclusion with respect to matters within the scope of the relationship." *Quattrone*, 2021 WL 4295418, at *5 (internal quotation marks omitted). The plaintiff has not shown that there is no employer-employee relationship among and between the defendants in this case and those in the state court case, or that this lawsuit does not relate to matters within the scope of that relationship. Accordingly, the record establishes the second element of *res judicata*—that the previous state action involved the same parties or their privies.

## III.    Claims Could Have Been Asserted in the Prior Action

The third element is that the claims asserted in this action could have been raised in the earlier action. As to this third element, the Court must "consider whether the second lawsuit concerns 'the same claim—or nucleus of operative facts—as the first suit,' applying three considerations: '(1) whether the underlying facts are related in time, space, origin, or motivation; (2) whether the underlying facts form a convenient trial unit; and (3) whether their treatment as a unit conforms to the parties' expectations.'" *Soules v. Conn., Dep't of Emergency Servs. & Pub. Prot.*, 882 F.3d 52, 55 (2d Cir. 2018) (quoting *Channer v. Dep't of Homeland Sec.*, 527 F.3d 275, 280 (2d Cir. 2008)).

In this lawsuit, the plaintiff "repeatedly link[s]" her injuries "to the same course of unlawful conduct" alleged in the earlier state action—Epstein's sexual crimes against the plaintiff. *Id.* As the plaintiff explains, the claims here arise out of the defendants' "negligence

**SA9**

and intentional actions and [Mr. Wexner's] failure to supervise his own companies, properties, and employees." (ECF No. 42 at 18.) The defendants' alleged negligence that led to the events underlying both lawsuits would form a "convenient trial unit" and "conform[] to the parties' expectations." *Soules*, 882 F.3d at 55. And the inclusion of any new legal theory of liability against the federal defendants arising out of these same facts does not change the analysis under this element. "[W]hatever legal theory is advanced, when the factual predicate upon which claims are based are substantially identical, the claims are deemed to be duplicative for purposes of res judicata." *Quattrone*, 2021 WL 4295418, at *5.

The plaintiff argues that her claims depend on new evidence that was not available to her in the state action. "As a general rule, newly discovered evidence does not preclude application of res judicata." *In re Layo*, 460 F.3d 289, 292 (2d Cir. 2006). Exceptions may apply where "the evidence was either fraudulently concealed or when it could not have been discovered with due diligence." *Id.* A plaintiff "seeking to apply the fraud exception to *res judicata* must allege with particularly what the defendant did to conceal any material information and why it was unable to discover defendant's actions." *Ningbo Prod. Imp. & Exp. Co. v. Eliau*, No. 11-CV-650, 2011 WL 5142756, *9 (S.D.N.Y. Oct. 31, 2011) (internal quotation marks omitted). In other words, the plaintiff must plead fraud sufficient to satisfy the requirements of Federal Rule of Civil Procedure 9(b). *Rafter v. Liddle*, 704 F. Supp. 2d 370, 377 (S.D.N.Y. Mar. 30, 2010). "Wholly conclusory allegations of fraudulent concealment . . . are insufficient to avoid res judicata." *Barash v. N. Tr. Corp.*, No. 07-CV-5208, 2009 WL 605182, at *9 (E.D.N.Y. Mar. 6, 2009).

The plaintiff alleges that "the evidence released or discovered by the Plaintiff [] after the State Action[] includes [a] Vanity Fair article outlining the years of warnings various people

gave to Wexner regarding Epstein's crimes, Ghislaine Maxwell['s] 2020 unsealed deposition,
documentaries[,] and other news articles, and recent civil actions and criminal trials." (ECF No.
42 at 20.) The plaintiff alleges that "[t]here was nothing Plaintiff could have done to discover
this evidence in the State Action" because "Wexner and his legal team have gone through great
efforts to keep his name under seal and out of public filings." (*Id.*)

The plaintiff has not shown that the "'new evidence' [] was [] 'fraudulently concealed' or
impossible to 'discover[] with due diligence,' and accordingly, [she] cannot prevent the
application of res judicata." *Cho v. Blackberry Ltd.*, 991 F.3d 155, 169 (2d Cir. 2021) (citation
omitted). In an affirmation, the plaintiff's lawyer[10] cites "new evidence" about Mr. Wexner that
became public before she chose to dismiss her state action with prejudice in November 2020—
specifically, Ghislaine Maxwell's deposition transcript, which was unsealed in July 2020 (ECF
No. 42-1 ¶ 26); a Business Insider article published in October 2020, (*id.* ¶ 27); a Daily Beast
article published in September 2019 (*id.* ¶ 32); and a New York Times article published in July
2019 (*id.* ¶ 45). Much of the "'new evidence' [the plaintiff] relied on to bring [her] claims . . .
was publicly available prior to the dismissal" of her state action, and thus does not support her
allegation that this evidence could not have been discovered with due diligence. *Cho*, 991 F.3d
at 169. Therefore, the plaintiff's claims could have been asserted in the prior state action.[11]

---

[10] The defendants maintain that the Court should not consider counsel's affidavit because (1) it was never
incorporated into the plaintiff's complaint and is not within the purview of judicial notice, and (2) the
plaintiff's counsel is not competent to testify about what the plaintiff could have discovered when she
litigated the state action because he did not represent her in that case, and counsel in the state lawsuit did
not provide an affidavit. (ECF No. 44 at 14.) In any event, the affidavit does not establish that the
Court should apply an exception to *res judicata* because of fraud or the plaintiff's inability to discover
new evidence with due diligence.

[11] The Court does not consider the plaintiff's claims, made for the first time in her opposition to the
defendant's motion, under the Trafficking Victims Protection Reauthorization Act and the Racketeering
Influenced and Corrupt Organizations Act. The plaintiff "cannot amend [her] complaint by asserting
new facts or theories for the first time in opposition to Defendants' motion to dismiss." *K.D. ex rel.
Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 209 n.8 (S.D.N.Y.2013); *see also Lerner v.*

The plaintiff's claims in this lawsuit are thus barred by *res judicata*.

Because the Court finds that the plaintiff's claims are barred in their entirety by *res judicata*, it is not necessary to address the other arguments the defendants make for dismissal. Nevertheless, the defendants' jurisdictional argument also has merit. The plaintiff has not pled facts sufficient for general jurisdiction, as the Wexners are "citizen[s] of Ohio" (ECF No. 36 ¶ 12), and the plaintiff concedes that all the foundation defendants are incorporated and maintain their principal places of business in other states (*id.* ¶¶ 13–16). Even assuming that she means to invoke specific jurisdiction—which would be a leap, since the complaint used only the language of general jurisdiction in claiming the defendants were "essentially at home in New York" (*id.* ¶¶ 39–40, 42, 44, 46, 49)—her allegations are insufficient to demonstrate plausibly that there is specific jurisdiction over the defendants, as she "must make allegations establishing jurisdiction with some 'factual specificity' and cannot establish jurisdiction through conclusory assertions alone." *Cont'l Indus. Grp., Inc. v. Equate Petrochemical Co.*, 586 F. App'x 768, 769 (2d Cir. 2014).

---

*Forster*, 240 F. Supp. 2d 233, 241 (E.D.N.Y. 2003) ("New claims not specifically asserted in the complaint may not be considered by courts when deciding a motion to dismiss."). Accordingly, the Court does not consider these claims, which nevertheless are also barred by *res judicata*.

# CONCLUSION

For these reasons, the defendant's motion to dismiss is granted.

**SO ORDERED.**

                                        _____s/Ann M. Donnelly_____
                                        ANN M. DONNELLY
                                        United States District Judge

Dated: Brooklyn, New York
       February 29, 2024

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
JENNIFER D. ARAOZ,

     Plaintiff,        JUDGMENT
                  22-CV-0125 (AMD) (RML)

   -against-

THE NEW ALBANY COMPANY, LLC, et al.,

     Defendants.
------------------------------------------------------------- X
   A Memorandum, Decision and Order of the Honorable Ann M. Donnelly, United States

District Judge, having been filed on February 29, 2024, granting the defendant's motion to

dismiss; it is

   ORDERED and ADJUDGED that the defendant's motion to dismiss is granted.

Dated: Brooklyn, NY        Brenna B. Mahoney
   March 1, 2024        Clerk of Court


              By: */s/Jalitza Poveda*
                Deputy Clerk


**SA14**